**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL GRONDAL, a Washington resident; MILL BAY MEMBERS ASSOCIATION, INC., a Washington non-profit corporation<br>*Plaintiffs-Appellants*, | No. 20-35694<br><br>D.C. No.<br>2:09-cv-00018-RMP |
| v. | |
| UNITED STATES OF AMERICA; U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; CONFEDERATED TRIBES OF THE COLVILLE RESERVATION,<br>*Defendants-Appellees*, | OPINION |
| v. | |
| WAPATO HERITAGE LLC; GARY REYES,<br>*Defendants-Appellants*, | |
| and | |
| FRANCIS ABRAHAM; PAUL G. WAPATO, JR.; KATHLEEN DICK; DEBORAH BACKWELL; CATHERINE GARRISON; MARY JO GARRISON; ENID T. WIPPEL; LEONARD WAPATO; ANNIE WAPATO; JUDY ZUNIE; JEFFREY M. | |

CONDON; VIVIAN PIERRE; SONIA W.
VANWOERKOM; ARTHUR DICK;
HANNAH RAE DICK; FRANCIS J.
REYES; LYNN K. BENSON; JAMES
ABRAHAM; RANDY MARCELLAY;
PAUL G. WAPATO, JR.; CATHERINE L.
GARRISON; MAUREEN M.
MARCELLAY; LEONARD M. WAPATO;
MIKE MARCELLAY; LINDA SAINT;
STEPHEN WAPATO; MARLENE
MARCELLAY; DWANE DICK; GABE
MARCELLAY; TRAVIS E. DICK;
HANNAH DICK; JACQUELINE L.
WAPATO; DARLENE MARCELLAY-
HYLAND; ENID T. MARCHAND; LYDIA
A. ARNEECHER; GABRIEL
MARCELLAY; MIKE PALMER; SANDRA
COVINGTON,
*Defendants*.

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted August 9, 2021
Seattle, Washington

Filed December 30, 2021

Before:  Carlos T. Bea, Daniel A. Bress, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Bea

# SUMMARY[*]

## Bureau of Indian Affairs/Government's Tribal Trust Duty

The panel affirmed the district court's grant of the Bureau of Indian Affairs' motion for summary judgment and ejectment order in an action brought by a group of recreational vehicle owners seeking to retain their rights to remain on a lakeside RV park located on American Indian land held in trust by the Bureau.

Decades ago, a group of recreational vehicle ("RV") owners purchased fifty-year memberships to the RV park on a plot of land in Eastern Washington known as the Moses Allotment Number 8 ("MA-8"). However, the park's management had validly leased the park's land from its landowners for only twenty-five years.

In the 1900s, the United States originally issued title to the land to American Indian Wapato John, a member of the Moses Band of the Columbia Tribe, as an "allotment" in trust: a distinct plot of land set aside for Wapato John. According to the federal statute establishing this trust, the land's legal title vested in the United States, which was to hold the land in trust for ten years for Wapato John's sole use and benefit. The land's beneficial title (*i.e.*, the land's equitable title) vested in Wapato John. During the ten-year trust period, the land was to be managed by the Department of the Interior (now the Bureau of Indian Affairs) and was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

subject to restrictions on alienation, encumbrance, and state taxation. That trust period for MA-8 has been repeatedly extended over the years (and these trust extensions correspondingly extended the restrictions as well) such that to this day, the Bureau of Indian Affairs ("BIA") continues to hold legal title to the land in trust for beneficial interests of Wapato John's heirs, referred to as the individual allottees ("IAs"), and also for the Wapato Heritage LLC ("Wapato Heritage"), and the Confederated Tribes of the Coleville Reservation. The BIA's trust status, however, is in dispute.

In 1979, William Wapato Evans, Jr.. an heir of Wapato John, obtained approval from a majority of other IAs to lease the entirety of MA-8 to develop a recreational vehicle park—the Mill Bay RV Park. Evans negotiated and signed a Master Lease in 1984, under which the IAs leased use of MA-8 to Evans for a term of twenty-five years, but Evans retained an option to renew the lease for another twenty-five years. Thereafter, Evans developed and sold regular and expanded memberships to purchasers to use and park their vehicles in the RV park. After Evans's death, his company Wapato Heritage obtained Evans's interest under the Master Lease as the lessee of the MA-8 land. The Master lease expired in 2009, leaving unexercised the option to extend. *See Wapato Heritage, LLC v. United States (Wapato Heritage I)*, 637 F.3d 1033, 1040 (9th Cir. 2011).

Plaintiffs, Mill Bay Members Association ("Mill Bay") and RV owner Paul Grondal, filed this lawsuit seeking a declaratory judgment that would recognize their right to remain on MA-8 through 2034. In January 2010, the district court handed down the first order here on appeal. This order dealt with cross-motions for summary judgment by plaintiff Mill Bay, which claimed the right to retain possession of the MA-8 land used by its membership for their RVs, and by

defendant the BIA, which counterclaimed in trespass and sought Mill Bay's ejectment from the property. In that 2010 order, the district court rejected Mill Bay's attempt to remain on MA-8 and denied Mill Bay's claims for estoppel, waiver and acquiescence, and modification. After the district court's 2010 order, proceedings were significantly delayed due to concerns the court had with the IA-defendants' lack of legal representation. These representation issues are the subject of this case's companion appeal, *Wapato Heritage LLC v. United States*, No. 20-35357 (9th Cir. 2021), which the panel decided by a separate memorandum disposition. In 2020, the district court handed down the second ruling here on appeal. In this 2020 order, the district court granted the BIA's motion for summary judgment for trespass and ordered Mill Bay removed from MA-8. Mill Bay appealed and defendant Wapato Heritage joined Mill Bay's appeal on the issue of the BIA's standing to bring a trespass counterclaim on behalf of the IAs.

The panel first held that the MA-8 land remains held in trust by the United States, and the BIA, as holder of legal title to the land, had and has standing to bring its claim for trespass and ejectment against Mill Bay. The panel held that of the three transactions and trust extensions in MA-8's history that appellants challenged, none were legally deficient. The panel therefore first rejected the assertion that the MA-8 allotments vested legal title in the IAs in fee simple rather than in trust. The panel noted that the Supreme Court in *Starr v. Long Jim*, 227 U.S. 613, 621–22 (1913), held that the 1883 Moses Agreement and its implementing legislation, the Act of July 4, 1884, did not guarantee title in fee but instead permitted the United States to hold the allotments in trust. The panel next rejected appellants' assertion that when President Wilson extended the trust period for MA-8 until 1926 through his 1914 executive

order, he did so without statutory authority. The panel held that the Act of June 21, 1906, gave President Wilson the lawful authority to extend the trust period of the Moses Allotments through his 1914 executive order. Finally, the panel rejected appellants' argument that MA-8's trust period was not properly extended in 1936 after the passage of the 1934 Indian Reorganization Act ("IRA"). Based on the well-reasoned conclusion of the district court and the weight of the evidence in the record, including contemporary interpretations and consistent treatment for nearly a century, the panel rejected the argument that the Moses Allotments were non-reservation land outside of the scope of the 1934 IRA and its 1935 Amendment. The panel therefore affirmed the district court's conclusion that the 1935 Amendment extended the Moses Allotments' trust status.

Mill Bay next asserted that the BIA should be precluded under res judicata from seeking ejectment due to the BIA's involvement in 2004 state court litigation ("*Grondal* state litigation") that resulted in a 2004 Settlement Agreement permitting Mill Bay the right to use the property through 2034, in compliance with the Master Lease. The panel noted that the BIA was not itself a party to the *Grondal* state litigation or the 2004 Settlement Agreement. Nor was the BIA in privity with Wapato Heritage, concededly one of the parties to the *Grondal* state litigation. And Wapato Heritage's interest as the lessee under the Master Lease was quite different from the BIA's interest as trustee for the lessors under the same lease. Even setting aside that different parties were involved in the *Grondal* state litigation and in this lawsuit, the two cases also involved different claims. The panel therefore rejected Mill Bay's argument that the IAs and the BIA were precluded under res judicata from ejecting Mill Bay.

The panel rejected Mill Bay's assertion that Paragraph 8 of the Master Lease required Mill Bay's purported subleases to be preserved and assigned rather than cancelled because of the termination of the Master Lease.  The panel held that Paragraph 8 of the Master Lease did not apply at all because the Master Lease was not terminated by cancellation or otherwise.  Paragraph 8 did not apply when the Lease expires by the passage of time, as happened here.

Finally, Mill Bay argued that, based on the BIA's alleged prior representations that Mill Bay would be able to remain on MA-8 through 2034, the court should apply equitable estoppel to prevent the BIA from seeking Mill Bay's ejectment.  The district court concluded the equitable estoppel defense was not available under *United States v. City of Tacoma*, 332 F.3d 574 (9th Cir. 2003), which holds that the United States is not subject to equitable estoppel when it acts in its sovereign capacity as trustee for Indian land.  The panel concluded that *City of Tacoma* was not distinguishable, and that Mill Bay was barred from asserting its defense of equitable estoppel against the BIA.

**COUNSEL**

Sally W. Harmeling (argued), Robert R. Siderius, Jacob M. Knutson, and Joseph Q. Ridgeway, Jeffers, Danielson, Sonn & Aylward, P.S., Wenatchee, Washington, for Plaintiffs-Appellants Paul Grondal and Mill Bay Members Association, Inc.

Nathan Arnold (argued), Bruce Johnston, Emanuel Jacobowitz, Cloutier Arnold & Jacobowitz PLLC, Seattle, Washington; Tyler D. Hotchkiss and Dale M. Foreman, Foreman, Hotchkiss, Bauscher & Zimmerman, PLLC, Wenatchee, Washington; for Defendant-Appellant Wapato Heritage, LLC.

Manish Borde (argued), Borde Law PLLC, Seattle, Washington, for Defendant-Appellant Gary Reyes.

Joseph P. Derrig (argued), Assistant United States Attorney; Joseph H. Harrington, Acting United States Attorney; United States Attorney's Office, Spokane, Washington; Jean E. Williams, Acting Assistant Attorney General; John L. Smeltzer, Attorney; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees United States of America, United States Department of the Interior, and Bureau of Indian Affairs.

Brian W. Chestnut (argued), Brian C. Gruber, and Anna E. Brady, Ziontz Chestnut, Seattle, Washington, for Defendant-Appellee the Confederated Tribes of the Colville Reservation.

**OPINION**

BEA, Circuit Judge:

Decades ago, a group of recreational vehicle ("RV") owners purchased fifty-year memberships to a lakeside RV park. But as it turns out, the park's management had validly leased the park's land from its landowners for only twenty-five years. This case embodies the efforts of those RV owners to maintain access to their vacation getaway after the end of the twenty-five-year lease term. Complicating matters, the land in question is American Indian land: It is fractionally owned by the heirs of American Indian Wapato John and is currently held in trust by the United States' Bureau of Indian Affairs ("BIA"), although that trust status is very much in dispute.

In the litigation below, the RV owners sued to retain their rights to remain on the RV park through 2034; the BIA is a defendant by dint of its now-challenged status as trustee of the at-issue land. But once sued, the BIA quickly took the offensive with a counterclaim for trespass and ejectment against the RV owners who have admittedly continued to possess the RV park, even after the lease expired.

In this appeal, we consider the district court's grant of the BIA's motion for summary judgment on that counterclaim. To rule, we must delve into the 19th-century origins of Wapato John's trust land; interpret 20th-century executive orders and treaties; apply 21st-century estate statutes; and consider the barrage of legal arguments presented to us. After considering all that, and more, we affirm.

# I. BACKGROUND

## A. The Land at Issue

Moses Allotment Number 8 ("MA-8") is a plot of land in eastern Washington; the RV park is on that land. In the 1900s, the United States originally issued title to this land to American Indian Wapato John, a member of the Moses Band of the Columbia Tribe, as an "allotment" in trust: a distinct plot of land set aside for Wapato John. According to the federal statute establishing this particular trust, the land's legal title vested in the United States, which was to hold the land in trust for ten years for Wapato John's sole use and benefit. The land's beneficial title (*i.e.*, the land's equitable title) vested in Wapato John. During the ten-year trust period, the land was to be managed by the Department of the Interior (now the BIA) and was subject to restrictions on alienation, encumbrance, and state taxation. That trust period for MA-8 has been repeatedly extended over the years (and these trust extensions correspondingly extended the restrictions as well) such that to this day, the United States continues to hold legal title to the land, in trust for Wapato John's heirs.

Today, beneficial ownership in MA-8 is rather fractionated. Twenty-seven heirs of Wapato John—here, referred to as the individual allottees ("IAs")—own separate, undivided beneficial interests in the land. Wapato Heritage, LLC ("Wapato Heritage") and the Confederated Tribes of the Colville Reservation (the "Tribe") also hold undivided, beneficial interests in MA-8.[1] The BIA retains legal title as

---

[1] The Tribe owns a 32.2% interest in the land and Wapato Heritage (owned by the grandsons of a deceased individual allottee by the name of William Wapato Evans, Jr.) holds a 23.8% interest as a life estate; this

trustee to all such beneficial interests held by the IAs, Wapato Heritage, and the Tribe.

Throughout most of 20th century, MA-8 was left unimproved. But in 1979, William Wapato Evans, Jr. (an heir of Wapato John and then-holder of an approximately 5% beneficial interest in MA-8) sought to improve MA-8 and thereby generate income for himself and the other IAs. At that time, the IAs between them owned the vast majority of the beneficial interest in MA-8, and per BIA regulation, Evans obtained approval from a majority of those IA interests to lease the entirety of MA-8 to develop a recreational vehicle park (the "Mill Bay RV Park"). With approvals in hand, Evans negotiated and signed the "Master Lease."[2]

Under the terms of the Master Lease, signed in 1984, the IAs leased use of MA-8 to Evans for a term of twenty-five years, but Evans retained an option to renew the lease for another twenty-five years. To exercise this option, the Master Lease required Evans to provide written notice to both the Lessors (the IAs) and the BIA twelve months prior to the expiration of the original twenty-five-year term. The Master Lease permitted Evans to sublease the property upon written approval of the BIA and provided that such subleases would be assigned to the Lessors, rather than cancelled, if

_____

estate reverts to the Tribe after the death of Evans' last living great grandchild. Separately, around 4.5% of the land is held in fee.

[2] The Master Lease defines the "Lessee" as Evans, and the "Lessor" as individuals named in "Exhibit A." As it happens, Exhibit A could not be located and may not exist, but, per prior litigation, the parties here agree that the individuals listed in Exhibit A are the IAs who owned the fractionated interests in MA-8 at the time the Master Lease was signed. The BIA, as trustee, signed the Lease on behalf of the IA Lessors.

the Master Lease itself was terminated "by cancellation or otherwise."   Evans subleased most of MA-8 to his corporation, Mar-Lu, Ltd.[3]  He also subleased a portion of MA-8 to a development corporation owned by the Tribe for the operation of a casino.

Thereafter, Evans, through Mar-Lu, developed and sold "regular memberships" to the Mill Bay RV Park.  These "regular memberships" allowed purchasers to use and park their vehicles on the RV park on a first-come, first-served basis under the site plan of the Master Lease.[4]  Later, in 1989, Evans obtained approval from the BIA to modify the site plan so that Evans could sell "expanded membership[s]."  These expanded memberships, expressly subject to the terms of the Master Lease, granted members the "right to use" the Mill Bay RV Park and guaranteed them each a designated spot in the RV park.

## B.  Earlier Litigation

Two earlier lawsuits are relevant to this one.  First is the *Grondal* state court litigation between Evans and some of the RV owners who had purchased regular or expanded memberships at his park.  By 2001, the Mill Bay RV Park was losing money fast, and Evans notified RV owners who had purchased either a regular membership or an expanded membership that he would be closing the park.  Some of those members—Paul Grondal and the Mill Bay Members Association, Inc. ("Mill Bay")—sued in Washington state

---

[3] Evans also used his company "Chief Evans, Inc." to conduct business.

[4] Mill Bay's motion to supplement the record dated December 16, 2020, is **GRANTED**.

court to prevent the park closure.[5]  Evans died during the pendency of the litigation, at which point much of his assets were distributed by will to his company Wapato Heritage, including his rights under the Master Lease.  The personal representative for Evans' estate requested mediation of the *Grondal* state litigation.

At mediation, the parties settled and executed the 2004 Settlement Agreement, ultimately deciding that the RV park would not be closed.  The BIA was not named a party to the litigation and did not intervene as a party to the action; the BIA attended the mediation at the request of the parties but did not participate.  Under the terms of the 2004 Settlement Agreement, Mill Bay and Wapato Heritage agreed that Mill Bay would have the right, subject to compliance with the Master Lease, to continued use of the Mill Bay RV Park through 2034.  But it turned out that the Master Lease would not last near that long.

The second lawsuit was a federal court case concerning the Master Lease, which eventually reached this Court. Back in 1985, and shortly after signing the Master Lease, Evans had sent a letter to the BIA purporting to exercise the option to renew the Master Lease for 25 years through 2034. All parties to the Master Lease, as well as non-party the BIA, apparently assumed for the next twenty-two years that Evans' letter was sufficient to exercise that option.  The BIA never corrected Evans' or Mill Bay's understanding that the Mill Bay RV Park was properly leased through 2034, and Mill Bay made significant financial expenditures and commitments based on that understanding.

---

[5] Mill Bay's motion to take judicial notice dated May 21, 2021, is **GRANTED**.

Upon later investigation, however, the BIA came to believe that Evans' letter was insufficient. Recall that per the Master Lease, Evans could renew only by giving notice to both "the Lessor"—the MA-8 IAs—and to the BIA. But Evans had given notice only to the BIA, so in the BIA's view, Evans (and Wapato Heritage, who took over as Lessee on the Master Lease after Evans' death) had yet to successfully renew the Lease. In November 2007, the BIA sent a letter to Wapato Heritage that explained its position but noted that Wapato Heritage had two more months to notify the Lessor IAs and thereby properly exercise the renewal option. But instead of following that suggestion and so notifying the IAs, Wapato Heritage sent a response letter to the BIA disagreeing with the BIA's interpretation of the Master Lease renewal provision.

In 2008, and after the end of the period in which Wapato Heritage could correct the insufficient 1985 lease renewal, Wapato Heritage filed suit against the United States, arguing that Evans's 1985 letter had actually or substantially complied with the renewal notice terms of the Master Lease, or alternatively, that the BIA had approved the renewal and extended the lease's length. The district court ruled for the BIA, dismissing all of Wapato Heritage's claims either on a motion to dismiss or on summary judgment, and confirmed the BIA's understanding of the Master Lease: The IAs, not the BIA, were the "Lessors" and Evans had failed properly to notify the Lessor IAs of his intention to exercise the renewal option. *See Wapato Heritage, LLC v. United States*, No. CV-08-177, 2009 WL 3782869, at *3, *5 (E.D. Wash. Nov. 6, 2009) (granting the BIA's motion to dismiss for lack of subject-matter jurisdiction and motion for judgment on the pleadings); *Wapato Heritage, LLC v. United States*, No. CV-08-177, 2008 WL 5046447, at *5, *8 (E.D. Wash. Nov. 21, 2008) (granting in part the BIA's motion for summary

judgment). We affirmed. *See Wapato Heritage, LLC v. United States (Wapato Heritage I)*, 637 F.3d 1033, 1040 (9th Cir. 2011). The Master Lease expired in 2009, leaving unexercised the option to extend, and our 2011 decision has since become final as the Supreme Court has denied review.

## C. The Present Lawsuit

After Wapato Heritage lost its lawsuit challenging the interpretation of the Master Lease, Grondal (Wapato Heritage's purported sublessee under the Master Lease) and Mill Bay filed this lawsuit, seeking a declaratory judgment that would recognize their right to remain on MA-8 through 2034.[6] Here, Grondal and Mill Bay named as defendants the fractionated owners of MA-8 (*i.e.*, the IAs, Wapato Heritage, and the Tribe) as well as the BIA, which acts on behalf of the United States as trustee for American Indian lands. This appeal pertains to two separate orders from this lawsuit: (1) the district court's ruling of January 12, 2010; and (2) the district court's ruling of July 9, 2020.

In January 2010, the district court handed down the first order here on appeal. This order dealt with cross-motions for summary judgment by plaintiff Mill Bay, which claimed the right to retain possession of the MA-8 land used by its membership for their RVs, and by defendant the BIA, which counterclaimed in trespass and sought Mill Bay's ejectment. The BIA argued in its counterclaim that Grondal and Mill Bay no longer had any right to occupy MA-8 after the

---

[6] Mill Bay asserted six claims: estoppel; waiver and acquiescence; modification; agency abuse of discretion under the Administrative Procedures Act ("APA"); violation of the Fifth Amendment (namely, that the BIA's determination that the tenancy expired in 2009 "deprives Plaintiffs of their property rights without due process of the law"); and declaratory judgment.

expiration of the Master Lease; on that basis, the BIA sought their ejectment from the MA-8 property.

In that 2010 order, the district court rejected Mill Bay's attempt to remain on MA-8 and denied Mill Bay's claims for estoppel, waiver and acquiescence, and modification.[7] The district court also reconstrued those three claims as affirmative defenses to the BIA's trespass counterclaim, a characterization that appellants do not challenge, and took the opportunity to deny two of these affirmative defenses, namely: (1) that a provision of the Master Lease, paragraph 8, requires the Lessor (the IAs) to permit Mill Bay as "sublessees" to remain on the property because the Master Lease was ended by "cancellation or otherwise," and (2) that the 2004 Settlement Agreement precluded the BIA from ejecting Mill Bay under principles of res judicata. Finally, the district court denied as premature the BIA's motion for summary judgment on trespass and ejectment.[8]

After the district court's 2010 ruling, Wapato Heritage and Mill Bay changed litigation strategy. As part of the 2010 ruling on the BIA's counterclaim, the district court had

---

[7] The district court dismissed these three claims several reasons, including for failure to state a claim, issue preclusion, and lack of subject matter jurisdiction because of sovereign immunity. Separately, the district court granted the BIA's motion for summary judgment on Mill Bay's APA claim because there was no "final agency action" and on Mill Bay's Fifth Amendment claim because the United States did not waive its sovereign immunity. Here, Mill Bay does not challenge the district court's order granting the BIA's motion for summary judgment on Mill Bay's APA and Fifth Amendment claims.

[8] Ten years later in 2020, the district court reconsidered its concerns as to prematurity, granted the BIA's motion for summary judgment for trespass, and ordered Mill Bay removed from MA-8. This 2020 order is the second order here on appeal.

concluded that the BIA had authority as trustee for the MA-8 land to bring a trespass counterclaim on behalf of the IAs but lacked contractual authority under the Master Lease to do so because the BIA was not a party to that lease. Seeing an opening, Wapato Heritage then decided to challenge for the first time the trust status of MA-8. This issue is important, because the BIA's standing to pursue a trespass action against Wapato Heritage and Mill Bay depends on its status as holder of legal title as trustee to the MA-8 land. So when Wapato Heritage filed its answer to Grondal and Mill Bay's lawsuit, it also filed a cross-complaint against the United States that challenged the BIA's standing. Wapato Heritage argued that the trust period for MA-8 had expired at some point during the chain of trust period extensions that occurred throughout the 20th century.[9] Even though Mill Bay named Wapato Heritage as defendant in its original complaint, Mill Bay soon took up Wapato Heritage's trust argument in an effort to defend against the BIA's 2020 renewed motion for summary judgment, and Wapato Heritage and Mill Bay are now aligned on the trust issue.[10]

Finally, in July 2020,[11] the district court handed down the second ruling here on appeal. In this 2020 order, the

---

[9] Wapato Heritage's crossclaims—declaratory judgment, quiet title, and partition—all rely on the theory that MA-8 is no longer in held in trust but instead is owned outright in fee by the IAs.

[10] This argument contradicts Mill Bay's prior arguments, including assertions in Mill Bay's complaint that the BIA "manages [MA-8] in trust." It also contradicts an understanding evident in our prior decision in *Wapato Heritage I. See* 637 F.3d at 1035 ("The United States holds MA-8 in trust for Wapato John and his heirs . . . .").

[11] After the district court's 2010 order, proceedings were significantly delayed due to concerns the court had with the IA-

district court granted the BIA's motion for summary judgment for trespass (reconsidered its concerns as to prematurity) and ordered Mill Bay removed from MA-8. Mill Bay had argued in its defense that the BIA lacked standing to bring its trespass claim because the trust period for MA-8 had expired, depriving the BIA of its trustee status over MA-8 and thus of any injury-in-fact tied to Mill Bay's presence on MA-8. On this standing argument, the district court found: (1) that Mill Bay was judicially estopped from arguing that MA-8 was not held in trust because that argument contradicted Mill Bay's prior positions in the litigation; and (2) even if judicial estoppel did not apply, the trust period of MA-8 had not expired and the United States still held MA-8 in trust, thus giving the BIA standing. On the merits of the BIA's counterclaim, the district court found Mill Bay to be trespassers, denied Mill Bay's other defenses (including equitable estoppel), granted the BIA's motion for summary judgment, and ordered Mill Bay ejected.

While the district court's 2020 order left pending several crossclaims not at issue in this appeal,[12] the order resolved

_____

defendants' lack of legal representation. These representation issues are the subject of this case's companion appeal, *Wapato Heritage LLC v. United States*, No. 20-35357 (9th Cir. 2021), which we decide by separate memorandum disposition.

[12] The district court left pending crossclaims including Wapato Heritage's crossclaims against both the BIA and Wapato Heritage's fellow defendants and the BIA's crossclaim against Wapato Heritage. Wapato Heritage's crossclaims sought equitable relief while the BIA's crossclaim alleged that Wapato Heritage had failed to pay rent. Those claims are not raised on this appeal, and in any event, Wapato's crossclaims concerning MA-8's trust status were dismissed based on the district court's finding that MA-8 remained held in trust by the BIA. *See Grondal v. United States*, 513 F. Supp. 3d 1262, 1281 (E.D. Wash. 2021).

all claims involving Mill Bay, so pursuant to Federal Rule of Civil Procedure 54(b), the district court found no just reason for delay and directed entry of final judgment against Mill Bay, allowing for immediate appeal. Mill Bay challenges two issues from each of the district court's orders[13] and Wapato Heritage joins the appeal because our resolution of the trust status of MA-8 has preclusive effect upon its own crossclaims below. From the 2010 order, Mill Bay appeals the district court's decision to reject its defenses based on Master Lease paragraph 8, and res judicata per the 2004 Settlement Agreement. And from the 2020 order, Mill Bay appeals the district court's decision to reject its defenses based on equitable estoppel, and on the BIA's standing to represent the IAs as trustee of the MA-8 land. Wapato Heritage joins the challenge to the BIA's standing.

The ejectment order against Mill Bay was in the nature of an injunction so we have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). We affirm.

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo." *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009). Any deviations from this standard are noted below when applicable.

---

[13] The district court's 2010 order merges here with the 2020 order. *See United States v. 475 Martin Lane*, 545 F.3d 1134, 1141 (9th Cir. 2008) ("[I]nterlocutory order[s] merge[] in the final judgment and may be challenged in an appeal from that judgment." (quoting *Baldwin v. Redwood City*, 540 F.2d 1360, 1364 (9th Cir. 1976))).

## III. DISCUSSION

Despite the considerable cast of characters just introduced and the extensive backstory just presented, this episode's plot is relatively straightforward. In the district court's 2020 order, it granted the BIA's motion for summary judgment on the BIA's counterclaim for trespass and ejectment. We are asked to examine the district court's decision to deny four of Mill Bay's defenses against that counterclaim. These defenses are: (1) the BIA lacks standing to bring a trespass claim as trustee on behalf of the IAs because the MA-8 property is not in fact held in trust by the BIA, (2) res judicata precludes the BIA from relitigating Mill Bay's right to possess MA-8 because the BIA was involved in the *Grondal* state litigation that allegedly decided that same issue, (3) paragraph 8 of the Master Lease required Mill Bay's purported subleases to be preserved and assigned rather than cancelled because of the termination of the Master Lease, and (4) the BIA is bound under equitable estoppel from reversing its previous alleged representations that Mill Bay would be permitted to remain on MA-8 through 2034. We address each in turn.

## A. The BIA's Standing As Trustee of the MA-8 Land

First, both Mill Bay and Wapato Heritage appeal the district court's conclusion that MA-8 remains held in trust by the United States. At the outset, they dispute the district court's preliminary finding that Mill Bay is precluded from advancing this argument due to judicial and landlord-tenant estoppel. And on the merits, Mill Bay and Wapato Heritage reject the district court's ruling that the United States still holds MA-8 in trust. As Mill Bay and Wapato Heritage would have it, MA-8 is no longer trust land, depriving the BIA of standing to bring a trespass claim on the IA's behalf and seek Mill Bay's ejectment from MA-8. We deal first

with the estoppel issue and then proceed to the merits of Mill Bay and Wapato Heritage's argument that MA-8 is no longer held in trust.

### 1. Estoppel Is No Substitute for Subject Matter Jurisdiction: This Court Must Determine the BIA's Standing

Judicial estoppel is "not a substitute for subject matter jurisdiction." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1137 (9th Cir. 2012). We, like any other federal court, must assure ourselves of our "jurisdiction to entertain a claim regardless of the parties' arguments or concessions." *Id.* We must always examine whether the claimant has legal authority to prosecute the claim before turning to the merits. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Accordingly, estoppel cannot prevent us from analyzing the BIA's standing.

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The district court concluded Mill Bay deliberately changed its legal arguments in the middle of litigation to gain an advantage.[14] But regardless the merits of that determination, Mill Bay's theory—that the BIA lacks standing to bring its counterclaim because it does not hold legal title to MA-8 in trust—raises a legitimate Article III jurisdictional issue that we must examine; judicial estoppel does not permit us to dodge the

---

[14] Mill Bay originally argued that the BIA "manages [MA-8] in trust." Its current position is the opposite: "MA-8 is not Indian-trust land," depriving the BIA of any "authority to evict" Mill Bay.

question.   On that basis, the district court erred in finding Mill Bay was estopped from arguing the trust period for MA-8 had expired.

In addition to its judicial estoppel argument, the BIA argues that Mill Bay cannot contest the BIA's authority to bring a trespass action under landlord-tenant estoppel. Under the general landlord-tenant estoppel rule, "a tenant in peaceful possession is estopped to question the title of his landlord.   This doctrine is, of course, designed to prevent a tenant from defending a suit for rent by challenging his landlord's right to put him into possession." *Richardson v. Van Dolah*, 429 F.2d 912, 917 (9th Cir. 1970).   In other words, "[t]enants are never allowed to deny the title of their landlord, nor set up a title against him, acquired by the tenant during the tenancy, which is hostile in its character to that which he acknowledged in accepting the demise." *Williams v. Morris*, 95 U.S. 444, 455 (1877).

Landlord-tenant estoppel does not apply here, however, because the BIA is not Mill Bay's landlord: the IAs are.  Mill Bay seeks to annul the BIA's power to retake the MA-8 property after the expiration of the Master Lease, and thus challenges the BIA's trustee relationship to the IAs, not the beneficial or equitable title of the IAs, who are the lessors under the Master Lease.[15]  In other words, Mill Bay disputes the BIA's status as a manager between the IAs and Mill Bay's members; Mill Bay does not challenge the IAs' underlying property rights over MA-8.  So Mill Bay's claim

---

[15] Contrary to the BIA's assertion, Mill Bay's claimed right to possess MA-8 is not due solely to agreements predicated on federal trust title.  Mill Bay's membership agreements were made under the Master Lease which, although approved by the BIA, originated by obtaining majority consent of the interests held by the lessor IAs.

is not hostile to the ultimate character of the contractual relationship between lessor (here, the IAs) and lessee (here, Mill Bay) in the same way that a tenant's direct challenge would be hostile to a landlord's title. Moreover, to the extent the BIA seeks to use landlord-tenant estoppel to preclude arguments implicating standing and federal court jurisdiction, that position is incorrect. *Cf. Terenkian*, 694 F.3d at 1137 ("[J]udicial estoppel is not a substitute for subject matter jurisdiction . . . .").

We hold that Mill Bay cannot be estopped from arguing that the BIA lacks standing to bring its trespass claim.[16] We thus proceed and examine whether the United States holds the MA-8 land in trust.

## 2. *An Abridged History of MA-8*

To ground the forthcoming discussion of MA-8's trust status, we begin with an abridged history of the MA-8 land.[17] Recall that this case concerns an allotment of land to Wapato John, a member of the Moses Band of the Columbia Tribe. The relevant history starts in 1855, when the United States entered into the Yakama Nation Treaty, which required members of the Columbia Tribe (along with three other tribes) to relocate to the Yakama Reservation in what is now eastern Washington state. But the tribes did not relocate; they continued to remain on their ancestral lands. Instead, Chief Moses of the Columbia Tribe negotiated a new treaty

---

[16] We need not address whether Wapato Heritage's crossclaims are barred by sovereign immunity per the Quiet Title Act, 28 U.S.C. § 2409a.

[17] A more thorough history was compiled by Judge Peterson in the 2020 order below. *See Grondal v. Mill Bay Members Ass'n*, 471 F. Supp. 3d 1095, 1100–10 (E.D. Wash. 2020).

for his followers, resulting in the Executive Order of April 19, 1879, and the creation of the Moses Columbia Reservation, just west of the already established Colville Reservation, itself located in north-central Washington. Yet again, and treaty notwithstanding, Chief Moses and most of his followers still did not relocate to the newly established Columbia Reservation but stayed on the ancestral lands of the Columbia Tribe.[18]

In 1883, Chief Moses, along with chiefs of the Colville Reservation, negotiated a third agreement with the United States: the "Moses Agreement." The Moses Agreement again stipulated that the members of the Moses Band would relocate to a reservation—this time the Colville Reservation—but the agreement also provided for the issuance of allotments of individual parcels on the Columbia Reservation for those American Indians who wished to stay on that reservation. The remainder of the Columbia Reservation not parceled out as allotments to American Indians would be "restored to the public domain."[19] Congress ratified the Moses Agreement in the Act of July 4, 1884. Thereafter, Chief Moses led most of his people to the Colville Reservation, where their descendants largely remain to this day.

To address those American Indians who did not choose to relocate to the Colville Reservation and instead chose to stay on the Columbia Reservation, Congress passed the Act

---

[18] A small group did relocate.

[19] In other words, the land of the Columbia Reservation that was not allotted to American Indians who had decided to stay became owned by the federal government.

of March 8, 1906.[20]  That Act provided that the United States would issue trust "patents" to each American Indian who stayed on the Columbia Reservation.  These patents, the equivalent of modern-day property deeds, vested legal title to each land allotment in trust to the United States and beneficial title (*i.e.*, equitable title) in the American Indian holder for a period of ten years, and provided that thereafter the land would pass to the American Indian in fee.[21]  Wapato John was one such American Indian who elected to stay on the Columbia Reservation and, in 1907 and 1908, he was issued trust patents for the MA-8 allotment, to be held by the United States in trust until 1916.

But the MA-8 trust patents were not to expire and convert to fee simple deeds in 1916 after all.  As it happens, many American Indians had received trust patents that had expired before MA-8's planned 1916 expiry and many of them had sold their allotments as soon as their periods of trust had ended.  (The end of the trust period meant that the restrictions on alienation that accompanied trust status also ended.)  Many of these land sales were "unwise or even procured by fraud," *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992) (internal citations omitted), and so the sales became a matter of some significant public concern.  To prevent further unwise or fraudulent sales, the United States settled on a policy in the early 20th century that sought to extend the trust period for all American Indian allotments and thus

---

[20] The record sheds little light on what happened to the MA-8 land between 1884 and 1906, and in any event, no party brings any legal arguments pertaining to that 22-year period.

[21] As mentioned earlier, the patents also subjected the allotted land to restrictions on alienation and encumbrance during the trust period.

continue indefinitely to restrict alienation by requiring trustee approval of sales or other possessory interests.[22]  In accord with that policy, President Wilson issued Executive Order 2109 in 1914, which purported to extend the trust period on the Moses Allotments for an additional ten years through 1926.  In 1926, President Coolidge issued another executive order again extending the trust period for ten years through March 8, 1936.

Recognizing the perceived failure of the allotment system given the many American Indians who had lost their allotted land through unwise or fraudulent transactions, Congress in 1934 enacted the Indian Reorganization Act ("IRA"), which indefinitely extended the trust period for all "Indian lands," which includes MA-8.[23]  25 U.S.C. § 5102.  However, the IRA contained an opt-out provision, which allowed reservations to choose not to be subject to the IRA (including the indefinite extension of the trust period) upon

---

[22] The Supreme Court has described why the trust restrictions became an enduring feature of United States policy:

> Because allotted land could be sold soon after it was received, many of the early allottees quickly lost their land through transactions that were unwise or even procured by fraud.  Even if sales were for fair value, Indian allottees divested of their land were deprived of an opportunity to acquire agricultural and other self-sustaining economic skills, thus compromising Congress' purpose of assimilation.

*County of Yakima*, 502 U.S. at 254 (internal citations omitted).

[23] Excluded from the definition of "Indian lands" was "Indian holdings of allotments or homesteads upon the public domain outside the geographic boundaries of any Indian reservation now existing or established hereafter."  25 U.S.C. § 5111.  As discussed in more detail below, MA-8 does not fall within this exclusion.

a vote of a majority of adult American Indians in the reservation. *Id.* § 5125. Congress amended the 1934 IRA the next year in the Act of June 15, 1935, which extended the trust period through December 31, 1936, for all those reservations that opted out of the IRA.

By the time Congress enacted the 1935 Amendment, the Moses Allotments were scheduled to fall out of trust status in March 1936, when the 10-year trust extension enacted by President Coolidge's 1926 executive order would expire. But the Colville Reservation, including Chief Moses,[24] voted to exclude itself from the IRA. And because the Moses Band was part of the Colville Tribe, and some of the Moses Allotments' beneficial owners, Wapato John included, were members of the Moses Band, the BIA understood the Colville Reservation's vote to exclude the Moses Allotments from the IRA too. Relying on this vote, the government applied the 1935 Amendment to the Moses Allotments also, thereby extending MA-8's trust period through the end of 1936.[25]

President Roosevelt then extended the Moses Allotments' trust period further by Executive Order 7464 in September 1936, and the Allotments' trust period was further extended without controversy by additional executive orders and administrative action. Finally, in 1990 Congress indefinitely extended the trust period of all lands

---

[24] Chief Moses, along with members of other tribes, would all soon form the Confederated Tribes of the Colville Reservation, defendants-appellees here.

[25] The government's basis for applying the 1935 Amendment to the Moses Allotments is analyzed in more detail below.

held in trust by the United States for American Indians. *See* 25 U.S.C. § 5126.

### 3.  *The Legal Status of MA-8 and the BIA's Standing to Sue on the IA's Behalf*

The issues here involve interpretation of statutes and executive orders and are therefore reviewed de novo. *See United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008).

Of the complex chain of trust period extensions and property transactions described above, Mill Bay and Wapato Heritage challenge three, and argue that legal deficiencies in each of these three steps independently deprive MA-8 of trust status, vest legal title in the IAs in fee simple, and strip the BIA of its powers as trustee and of its standing to seek ejectment in this suit.

### i.  *Challenge One: Whether MA-8's Trust Patent Was Issued Contrary to Law*

Mill Bay and Wapato Heritage first argue that the Moses Agreement and its implementing legislation, the Act of July 4, 1884, promised patents in fee, not patents in trust.[26]  So, they argue, the trust patents given to the IAs under the Act of March 8, 1906, were issued contrary to the Moses Agreement.  The Supreme Court in 1913 examined this issue as to allotments under the Moses Agreement. *See Starr v. Long Jim*, 227 U.S. 613, 621–22 (1913).  Justice Pitney, on behalf of a unanimous Court, held that the Moses Agreement's language did not guarantee title in fee but

---

[26] The Act of July 4, 1884, stated that the allottees would be "entitled to 640 acres, or one square mile of land to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected."

instead permitted the United States to hold the allotments in trust. *See id.* at 623–25. So we reject Mill Bay and Wapato Heritage's claim that the MA-8 allotments were vested in fee simple rather than in trust by the Moses Agreement and the Act of July 4, 1884.

> ii. *Challenge Two: Whether President Wilson Had Statutory Authority to Extend MA-8's Trust Period with his 1914 Executive Order*

Mill Bay and Wapato Heritage's second argument is that when President Wilson extended the trust period for MA-8 until 1926 through his 1914 executive order, he did so without statutory authority. The 1914 executive order relied on two statutes to extend the trust period of MA-8: Section 5 of the Act of February 8, 1887 (the "General Allotment Act"), and the Act of June 21, 1906. Mill Bay and Wapato Heritage argue that neither of the two statutes granted the President the authority to extend MA-8's trust period. We need not address the General Allotment Act because we conclude that the 1906 Act provided a sufficient basis for President Wilson's 1914 executive order.

The Act of June 21, 1906 provides:

> Prior to the expiration of the trust period of any Indian allottee to whom a trust or other patent containing restrictions upon alienation has been or shall lie issued under any law or treaty the President may in his discretion continue such restrictions on alienation for such period as he may deem best . . . .

25 U.S.C. § 391. Mill Bay and Wapato Heritage argue that this act cannot support the 1914 executive order because it grants the President only the authority to extend "restrictions

on alienation." They argue that the authority to extend a "trust period" is different. The BIA responds that "restrictions on alienation" and "trust[s]" are not distinguishable from one another, and that the power to extend one should be read to be coextensive with the power to extend the other.

Mill Bay and Wapato Heritage's position has some initial appeal. From a textual standpoint, a "restriction[] on alienation" and a "trust period" are different concepts. While both can be "continued," *i.e.*, extended in time, "restrictions on alienation" are substantive limitations on a trust beneficiary's property rights but a "trust period" merely delineates when a trust expires. A second textual clue also points in Mill Bay and Wapato Heritage's favor. The statute discusses "other patent[s] containing restrictions upon alienation," which contemplates that a patent can be in a form other than a trust but still contain restrictions on alienation; if so, the restrictions on alienation applicable to those non-trust patents can be extended without the corresponding extension of any trust period. And a long-standing truth of federal Indian law aids Mill Bay and Wapato Heritage too. Historically, American Indian land held in trust generally had three main components: a restriction on alienation, a restriction on encumbrances, and a restriction on being subject to state taxation. *See United States v. Mitchell*, 445 U.S. 535, 544 (1980) (noting that the 1887 General Allotment Act was meant to "prevent alienation of [American Indian] land and to ensure that allottees would be immune from the state taxation"); 25 U.S.C. § 348; 25 U.S.C. § 349 ("At the expiration of the trust period . . . the Secretary of the Interior may . . . cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed."). The restriction on alienation by

itself is thus just one component of trust status.  So when the Act of June 21, 1906, grants the authority to extend only "such restrictions on alienation"—but not the other restrictions typically placed on trust lands—the language could imply that the President was not granted the authority to extend the trust period as a whole.

While Mill Bay and Wapato Heritage's position is thus not without some force, the points supporting the BIA's position are stronger still.  Put simply, a trust is itself a restriction on alienation.  The trustee, as holder of legal title, is the required grantor of any conveyance of legal title.  And trust patents like those given to Wapato John inherently contained restrictions on how the American Indian allottee could sell their property.  Indeed, the Supreme Court has recognized that restricting alienation was the very point of trust status.  *See Mitchell*, 445 U.S. at 544 (noting that Congress extended trust status to American Indian allotments "not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land").  As described above, Congress repeatedly extended the trust period of many allotments for the precise purpose of preventing American Indians from selling their land. *See Yakima*, 502 U.S. at 251 (describing how Congress sought to prevent American Indians from selling their land by ensuring that "each allotted parcel would be held by the United States in trust").  And if a trust is, itself, a restriction on alienation, then the power to "continue such restrictions on alienation" includes the power to continue the period of a trust.

Several textual clues in the 1906 Act support the BIA's view.  First, the relevant provision of the Act begins: "Prior to the expiration of the trust period of any Indian allottee

. . . ."    This preface indicates that the provision deals primarily with trust patents (like MA-8).  The preface thus suggests that the operative portion of the provision—the portion authorizing an extension in time—applies to the period of trusts.    Second, the provision discusses both "trust[s]" and "other patent[s] containing restrictions upon alienation" and authorizes the President to "continue such restrictions on alienation."  As just explained, one "such" restriction on alienation is the trust itself that the provision identifies as its primary subject.   And third, the series qualifier canon demands that when we interpret "a trust or other patent containing restrictions upon alienation," we construe "containing restrictions upon alienation" to modify both "trust" and "other patent,"[27] reinforcing that American Indian trusts both contain and inherently are restrictions on alienation of land.  These clues all suggest that the statute's authorization to extend restrictions on alienation authorizes the President to extend, for trust patents, both the trust period and the restrictions on alienation inherent in trust patents, and for non-trust patents, to extend any restriction on alienation.[28]

---

[27] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.").

[28] Further evidence to this effect can be found in the 1934 Indian Reorganization Act.  In that Act, Congress extended indefinitely the trust period for allotments: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." 25 U.S.C. § 5102.   Although Congress referenced both concepts, Congress did not decouple the trust period and the restriction on alienation.  Instead, Congress took special pains to highlight that the

Consistent with the BIA's view that American Indian trusts were, themselves, restrictions on alienation, numerous historical sources indicate that at and around the time when Congress passed the Act of June 21, 1906, the terms "trusts" and "restrictions on alienation" were historically conflated, used interchangeably, or treated identically. *See, e.g.*, Felix S. Cohen, *Handbook of Federal Indian Law* § 16.03 (2012) ("Allotment is a term of art in Indian law, describing either a parcel of land owned by the United States in trust for an Indian ('trust' allotment) or owned by an Indian subject to a restriction on alienation in the United States or its officials ('Restricted' allotment). . . . In practice, the Department of the Interior has treated the two forms of tenure identically for virtually all purposes."); *West v. Oklahoma Tax Comm'n*, 334 U.S. 717, 726 (1948) ("We fail to see any substantial difference for estate tax purposes between restricted property and trust property."); *United States v. Ramsey*, 271 U.S. 467, 470 (1926) ("[A] trust allotment and a restricted allotment, so far as that difference may affect the status of the allotment as Indian country, was not regarded as important."); 18 U.S.C. § 1162 ("Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real . . . property, . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States."); 43 C.F.R. § 4.201 ("Restricted property means real property, the title to which is held by an Indian but which cannot be alienated or encumbered without the Secretary's consent. For the purposes of probate proceedings, restricted property is treated as if it were trust property."); Executive Order No. 3365 (December 7, 1920)

restrictions on alienation are included within the trust by referencing the "restriction[s] on alienation thereof [the trust]" as opposed to "thereon the land." This offers some measure of additional evidence that the restriction on alienation is a primary attribute of the trust status.

("It is hereby ordered, under authority found in the act of June twenty-first, nineteen hundred and six . . . , that the trust or other period of restriction against alienation contained in any patent heretofore issued to any Indian for any lands on the public domain be, and the same is hereby, extended . . . ."); 25 C.F.R. ch. I app. (1998) (citing executive orders that continued the trust period of American Indian land under the Act of June 21, 1906).

The relationship between restrictions on alienation and the other two restrictions that historically comprised trust status—the restrictions on encumbrance and on state taxation—also supports the BIA's interpretation. At first glance, the restriction on alienation is just one of the three distinct restrictions that characterize trust status over American Indian land. This provides some support for the argument that "restrictions on alienation" and "trusts" are different, and correspondingly, that the 1906 Act's grant of power to extend the former does not authorize extensions of the latter. But in fact, the Supreme Court has explicitly tied the restriction on alienation to the restrictions on encumbrances and on state taxation. In *Goudy v. Meath*, the Supreme Court determined that removal of the restriction on alienation also removes the restrictions on encumbrance and state taxation—even if the statute did not expressly remove those restrictions. *See* 203 U.S. 146, 149 (1906); *see also County of Yakima*, 502 U.S. at 263–64 ("Thus, when [the General Allotment Act] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes."). And *Yakima* itself found that the "alienability of the allotted lands" was "of central significance" in determining whether the lands were taxable, 502 U.S. at 251, a connection this court has already recognized, *see Lummi Indian Tribe v. Whatcom County*, 5 F.3d 1355, 1357 (9th Cir. 1993) ("In *Yakima Nation*, the

[Supreme] Court found an unmistakably clear intent to tax fee-patented land . . . concluding . . . that the land's alienable status determines its taxability."). If the three trust restrictions—alienation, encumbrance, and state taxation— all begin and end simultaneously, then the power to extend the restriction on alienation also impliedly confers the power to extend the restrictions on encumbrance and taxation. And if the power to extend the restriction on alienation confers the power to extend all three restrictions, then that power most reasonably also confers the power to extend the trust period, which comprises and determines the expiration of those same three restrictions.

The BIA's interpretation has one more advantage: It keeps the restriction on alienation in parallel with the restrictions on encumbrances and on state taxation. Indeed, the Supreme Court has recognized that it would be "strange" to decouple the restriction on alienation inherent in a trust patent from the other aspects of the trust, including the restriction preventing state taxation. *See Goudy*, 203 U.S. at 149. And that decoupling would be doubly strange given that many American Indians who owned fee-simple allotments that passed out of trust status were often driven to sell those allotments precisely because of their newfound tax burden. *See* Cohen, *Handbook of Federal Indian Law* § 1.04 (offering a generalized description of how individual American Indians lost allotments); Kristen A. Carpenter, *Contextualizing the Losses of Allotment Through Literature*, 82 N.D. L. REV. 605, 610 (2006) (noting that after trust restrictions wore off, many American Indians "could not meet state tax payments [and either] lost their allotments in foreclosures" or "sold their property outright to generate cash for food and necessary goods").

With all these reasons in mind, it should come as no surprise that every other interpretation of the Act of June 21, 1906, that we have found—from the Supreme Court all the way down to unpublished agency legal opinions—has stated that the Act granted the President this dual authority to extend trust periods on trust patents and periods of restrictions on alienation on other types of patents. *See DeCoteau v. Dist. Cnty. Ct.*, 420 U.S. 425, 443 n.29 (1975) ("Congress has several times authorized extensions of trust relations with respect to Indian tribes, *e.g.*, Acts of June 21, 1906, 34 Stat. 326 . . . ."); Cohen, *Handbook of Federal Indian Law* § 16.03[4][b][ii] ("The President . . . was authorized to extend the trust period [of trusts formed under the General Allotment Act of 1887, and in [the Act of June 21,] 1906, Congress broadened the presidential power to include all allotments."); Department of Interior, Opinion Regarding the Status of the Bed of the Clearwater River Within the 1863 Treaty Boundaries of the Nez Perce Reservation (Idaho), 2016 WL 10957295, at *23 n.74 (January 15, 2016) ("Section 5 of the [General Allotment] Act directed the Secretary to hold in trust . . . patents to the allotments for a period of twenty-five years before transferring fee title to the allottees [and] also allowed the President discretion to extend this trust period. Following an Attorney General opinion narrowly construing that discretion, 25 Op. Att'y Gen. 483 (1905), Congress enacted a statute [(the Act of June 21, 1906)] explicitly authorizing broad discretion in extending trust periods.  25 U.S.C. § 391."); 25 U.S.C. 415(a) (2006) (amended in 2006 to recognize that MA-8 remains held in trust); *cf. United States v. Bowling*, 256 U.S. 484, 488 (1921) (noting that "Congress has treated and construed [a separate provision similar to that at issue here] as including both trust and restricted allotments").

All told, virtually everything favors the BIA's interpretation of the 1906 Act: the structure of the relevant provision of the Act; the fact that trust patents and other patents containing restrictions on alienation were historically treated identically or conflated; and the combined weight of over one hundred years of interpretations that the 1906 Act authorized trust period extensions. We thus conclude that the better interpretation of the 1906 Act is that it did grant the President the authority to extend the period of a trust patent, not just the authority to extend the restriction on alienation imposed on a trust patent.

Even acknowledging, however, that Mill Bay and Wapato Heritage presented a reasonable alternative construction to this ambiguous statutory phrase, deference to the BIA counsels us against choosing that alternative. We assume that the BIA would only be entitled deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and not *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Skidmore*, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (citing *Skidmore*). Here, the BIA's expertise and the persuasiveness of its reasoning entitles it to some measure of deference under *Skidmore*.

In sum, although the Act of June 21, 1906, lends itself to multiple interpretations, the best interpretation is that it afforded the President the authority to extend the trust period of trust allotments created by trust patents, not just the authority to extend restrictions on alienation for patents other

than trust patents.  We reach this conclusion based on our own reading of the text of the statute, our understanding of the original meaning given the statute's terms, and the consistency and persuasiveness of the interpretation of the statute by the President and the BIA.  We hold that the Act of June 21, 1906, gave President Wilson the lawful authority to extend the trust period of the Moses Allotments through his 1914 executive order.

### iii. Challenge Three: Whether MA-8's Trust Period Was Extended by the Act of June 15, 1935

Finally, Mill Bay and Wapato Heritage argue that MA-8's trust period was not properly extended in 1936 after the passage of the 1934 IRA.  At issue is the six-month period between March 1936, when the trust extension enacted by President Coolidge's executive order expired, and September 1936, when President Roosevelt's executive order extended MA-8's trust period yet again.  Recall that the 1934 IRA indefinitely extended the trust period of all "Indian lands," 25 U.S.C. § 5102, but excluded "Indian holdings of allotments or homesteads upon the public domain outside the geographic boundaries of any Indian reservation now existing or established hereafter," 25 U.S.C. § 5111.  Recall further that the IRA also excluded reservations that affirmatively voted to opt out of the act, *see* 25 U.S.C. § 5102, but that the Act of June 15, 1935, amended the IRA and extended through December 31, 1936, the trust period for certain other American Indian lands.  To fall under this 1935 Amendment, land must have met two criteria: (1) the land's "period of trust or of restriction" must not have "been extended to a date subsequent to December 31, 1936"; and (2) "the reservation containing such lands" must have voted to exclude itself from the IRA.

Reviewing these provisions, the district court confirmed the BIA's long-standing position: The Colville Reservation voted to opt out of the 1934 IRA; this vote applied to the Moses Allotments; and the 1935 Amendment extended the trust period of the Moses Allotments until December 1936. The 1935 Amendment's trust extension thus bridged the six-month gap between March and September of 1936, when neither President Coolidge's nor President Roosevelt's executive order applied to MA-8.  Mill Bay and Wapato Heritage disagree and contend that neither the 1934 IRA nor the 1935 Amendment applied to the allotments.  In their view, the Moses Allotments' trust period expired in March 1936; the further trust period extension enacted by President Roosevelt's September 1936 executive order was ineffective as by then the allotments' trust period had already expired.

We reject Mill Bay and Wapato Heritage's view. Assume for a moment, as the district court found and as the BIA has maintained for nearly a century, that the Colville Tribe's vote to exclude itself from the 1934 IRA did apply to the Moses Allotments.  Under this assumption, the allotments' trust period was not extended by the 1934 IRA, and the allotments meet the 1935 Amendment's first criterion: When the 1935 Amendment was passed, the allotments' "period of trust or of restriction" had not yet "been extended to a date subsequent to December 31, 1936."[29]  This leaves the second criterion, whether "the

---

[29] While Mill Bay and Wapato Heritage argue that the Colville Tribe's vote to exclude itself from the 1934 IRA did not apply to the Moses Allotments, they agree that as of the enactment of the 1935 Amendment, the Moses Allotments' trust period had not been extended past December 31, 1936.  And in any event, we will soon turn to Mill Bay and Wapato Heritage's argument about the Colville Tribe's vote.

reservation containing [the Moses Allotments]" voted to exclude itself from the IRA.

Mill Bay and Wapato argue that the Moses Allotments fail this second criterion for two reasons.  First, they argue that the Moses Allotments are not "reservation" land.  In their view, the allotments thus fall outside the scope of the 1935 Amendment, which is limited to "lands" "contain[ed]" on a "reservation."[30]    And second, they argue that the Colville Reservation's vote to exclude itself from the 1934 IRA cannot be imputed to the Moses Allotments.

The district court drew its conclusion that the Moses Allotments' land was (and is) "reservation" land from several sources.  The district court pointed to: (1) multiple BIA annual reports from near the time the 1935 Amendment was passed which listed the "Columbia (Moses agreement)" as a "reservation belonging to the Moses Band," (2) historical descriptions from the Colville Agency that listed the Moses Tribe as living on the Moses Allotments and the Colville Reservation, and (3) an 1891 map that labeled the Moses Allotments, not as public domain, but as "Indian" land—the same as the Colville Reservation.

The district court also noted that these same sources ruled out alternative understandings of the allotments' status.  If the allotments were not reservation land, they must have been either "allotments or homesteads upon the public domain outside of the geographic boundaries of any Indian reservation," 25 U.S.C. § 5111, the two types of land

---

[30] Mill Bay and Wapato Heritage also argue that the Moses Allotments are non-reservation land and thus fall outside the scope of the 1934 IRA, given its exclusion for "Indian holdings of allotments or homesteads upon the public domain outside the geographic boundaries of any Indian reservation."  25 U.S.C. § 5111.

expressly excluded from the 1934 IRA. But the BIA reports never listed the Moses Allotments as public domain or homestead allotments, and Mill Bay and Wapato Heritage point to no historical evidence supporting their understanding.[31]

Further, and as the BIA notes, the Moses Allotments' unique history is a poor fit for the IRA's description of non-reservation land, again either "allotments or homesteads upon the public domain outside of the geographic boundaries of any Indian reservation." 25 U.S.C. § 5111. The Moses Allotments are admittedly "outside the geographic boundaries" of the Colville Reservation. But the allotments were originally selected from land *inside* the "geographic boundaries" of the Columbia Reservation, a reservation that has yet to be disestablished, and were not taken from land "upon the public domain." Further, the BIA points to other types of land that fit the terms of the IRA's description of non-reservation land far more cleanly. At the time Congress enacted the IRA, it commonly allotted lands from the public domain to individual American Indians who did not reside on reservations. The IRA's description of non-reservation land "upon the public domain outside of the geographic boundaries of any Indian reservation" reads more naturally to refer to that land—land that was taken from the public domain and was never part of any reservation whatsoever— than to the Moses Allotments, which, again, were formed from the Columbia Reservation rather than from the public domain.

---

[31] They cite a single 2009 document that describes the MA-8 allotments as "Colville Public Domain," but that record does not suggest that the allotments are on land that is the "public domain" of the United States. Rather, it shows that the United States understands the land to be on the "Public Domain" of the Colville Tribes.

Mill Bay and Wapato Heritage disagree.  In their view, because the Moses Allotments were held not in trust on behalf of a tribe but held for individual American Indians, they are not reservation land.  They base their argument in the Supreme Court's statement that "tribal ownership was a critical component of reservation status."  *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 346 (1998).  But properly read in context, that passage does not support their argument.  Both *Yankton Sioux* and the case that *Yankton Sioux* cited for its "tribal ownership" language drew a distinction between ownership by American Indians and ownership by non-Indians, not between ownership by tribes and ownership by individual American Indians.  *See id.* (describing the Yankton Sioux's decision to sell some of its territory to "non-Indian homesteaders"); *Solem v. Bartlett*, 465 U.S. 463, 468 (1984) ("Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, *individual allotments*, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians.") (emphasis added).  *Yankton Sioux* thus lends no support to Mill Bay and Wapato Heritage's argument that allotments for individual American Indians are non-reservation land under the IRA.

Mill Bay and Wapato Heritage also argue that the contemporary reports cited by the district court are not entitled to evidentiary weight because they do not analyze the question whether MA-8 is reservation land, but merely assume it.  We disagree.  Contemporary agency interpretations have "great weight" when it comes to determining the meaning of statutes at the time they were enacted.  *Cruz v. Zapata Ocean Res., Inc.*, 695 F.2d 428, 431 (9th Cir. 1982).  Here, the BIA's evidence shows that the agency consistently applied the provisions of the 1935 Amendment to the Moses Allotments, referred to them as

reservation allotments, and did not treat the Moses Allotments as homestead or public domain allotments. This evidence has significant probative value and supports the district court's conclusion below and our conclusion on appeal.

Last, Mill Bay and Wapato Heritage argue that the 1935 Amendment does not apply to the Moses Allotments because the 1935 Amendment covers only reservations that rejected the 1934 IRA and the Secretary of the Interior did not call a vote for the Columbia Reservation or the Moses Allotments. But again, the Colville Reservation rejected the 1934 IRA and this vote does apply to the Moses Allotments. The Moses Band of American Indians—the tribe of which the original Moses Allotment allottees were members—could and did participate in that vote, and the Colville Agency, which held the vote, also administered the Columbia Reservation that contains the Moses Allotments.[32] The Moses Allotments needed no separate vote. And even if Mill Bay and Wapato Heritage were correct that the Colville Reservation's vote did not apply to the Moses Allotments, the allotments would still be reservation land within the scope of the 1934 IRA because of all the compelling reasons just given above. So if Mill Bay and Wapato Heritage's argument were correct, then because the Colville Reservation's vote against the IRA did not apply to the Moses Allotments, the Moses Allotments never voted against the application of the IRA and the IRA would have indefinitely extended MA-8's trust status regardless.

Based on the well-reasoned conclusion of the district court and the weight of the evidence in the record, including contemporary interpretations and consistent treatment for

---

[32] Even today, the MA-8 individual allottees are virtually all members of the Confederated Tribes of the Colville Reservation.

nearly a century, we reject Mill Bay and Wapato Heritage's argument that the Moses Allotments were non-reservation land outside of the scope of the 1934 IRA and its 1935 Amendment. We thus affirm the district court's conclusion that the 1935 Amendment extended the Moses Allotments' trust status.

\* \* \*

To summarize, we hold that of the three transactions and trust extensions in MA-8's history that Mill Bay and Wapato Heritage challenge, none were legally deficient. The MA-8 land remains held in trust by the United States, and the BIA, as holder of legal title to the land, had and has standing to bring its claim for trespass and ejectment against Mill Bay.

## B. Res Judicata

Mill Bay's second defense is that the BIA should be precluded from seeking ejectment due to the BIA's involvement in the 2004 *Grondal* state litigation between Mill Bay, Wapato Heritage, and Evans' estate[33] that resulted in the 2004 Settlement Agreement.[34] Recall that this agreement renegotiated certain requirements and dues under

---

[33] Evans died during the pendency of the *Grondal* state litigation.

[34] On this issue, the BIA offers its own res judicata argument: that Mill Bay was in privity with Wapato Heritage at the time of the 2004 Settlement and is thus bound by the 2011 Ninth Circuit's decision in *Wapato Heritage I*. The district court rejected BIA's collateral estoppel argument below because there was no identity of issue, and we affirm that holding. The government seeks to preclude Mill Bay from arguing that the 2004 Settlement extended the Master Lease, but *Wapato Heritage I* did not decide that question. *See* 637 F.3d at 1037–40. Even so, our conclusion here is fully consistent with the result in *Wapato Heritage I*.

the Regular and Expanded Membership Agreements (between Mill Bay and Wapato Heritage), and because the *Grondal* state litigation concerned Evans' estate, the settlement was entered pursuant to Washington's Trust Estate Dispute Resolution Act ("TEDRA"), RCW 11.96A. The settlement included provisions that increased rent due by Mill Bay to Wapato Heritage (with a schedule through 2034) and described the nature of Mill Bay's interest: "Mill Bay Members have a right to use the property . . . pursuant to the Prior Documents and this Agreement through December 31, 2034, subject to the terms of this Agreement and the Prior Documents."[35]  The settlement was "equivalent to a final court order binding on all persons interested in the estate or trust."  RCW § 11.96A.230.

Mill Bay believes that the settlement's guarantees—for instance, Mill Bay's "right to use the property . . . through December 31, 2034"—preclude the BIA from seeking to eject Mill Bay in this litigation.  The district court disagreed.  Mill Bay appeals the finding of the district court, arguing that the BIA and the IAs were parties under TEDRA, thus precluding the BIA from relitigating the terms of the settlement agreement.  District court judgments as to issue and claim preclusion are reviewed de novo. *See Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019).

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action.  For res judicata to apply there must be: (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity

---

[35] "Prior documents" included the Master Lease, Evans' sublease to Mar-Lu, and both the Regular and Extended Membership Agreements.

between parties." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) (cleaned up). Mill Bay fails to show that this litigation and the 2004 Settlement Agreement involved the same claims or the same parties (or involved parties in privity with one another).

The BIA was not itself a party to the *Grondal* state litigation or the 2004 Settlement Agreement. Mill Bay concedes as much: the BIA was asked to intervene in the suit but never did; the BIA attended mediation between the parties but did not participate; the BIA received notice of the settlement but did not object; and no such notice was sent to the IAs.

Nor was the BIA in privity with Wapato Heritage, concededly one of the parties to the *Grondal* state litigation. For two parties to have privity, they must be "so identified in interest . . . that [they] represent[] precisely the same right" on the relevant issues. *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (quoting *Sw. Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir. 1977)). But after Evans' death, Wapato Heritage obtained Evans's interest under the Master Lease as the lessee of the MA-8 land. And Wapato Heritage's interest as the lessee under the Master Lease is quite different from the BIA's interest as trustee for the lessors under the same lease. So Wapato Heritage and the BIA did not "represent[] precisely the same right." *In re Schimmels*, 127 F.3d at 881.

To show identity another way, Mill Bay argues that the BIA was an interested party under TEDRA and was required to object to the terms of the 2004 Settlement Agreement, which Mill Bay argues revised the Master Lease. TEDRA acts to bind "all persons interested in the estate or trust" to a settlement involving that estate. RCW § 11.96.220. "Persons interested in the estate" means:

all persons beneficially interested in the estate or trust, persons holding powers over the trust or estate assets, the attorney general in the case of any charitable trust where the attorney general would be a necessary party to judicial proceedings concerning the trust, and any personal representative or trustee of the estate or trust.

RCW § 11.96.030(6).

Mill Bay does not argue that the BIA was beneficially interested in Evans' estate or was a personal representative of Evans. Mill Bay argues only that the BIA held power over an estate asset—Evans' interest as a lessee of the MA-8 land under the Master Lease—because the BIA held authority under the Master Lease to withhold approval of any assignment of Evans' lease interest. Mill Bay provides no Washington caselaw defining "persons holding powers over estate assets" to include those persons who possess certain contingent rights pursuant to a contractual lease agreement. The available caselaw suggests instead that "powers" refers to more direct control over assets. *See Paunescu v. Eckert*, 193 Wash. App. 1050 at *3 (2016) (unpublished) (likening "persons holding powers over the trust assets" to the trustee); *In re Est. of Whitehead*, 139 Wash. App. 1038 at *5 & n.39 (2007) (unpublished) (likening "persons holding powers over estate assets" to a personal representative). Mill Bay does not argue that the BIA's status as trustee of and legal titleholder to MA-8 gave the BIA any "power" over any asset in Evans' estate, and the argument that Mill Bay does make finds no support in Washington caselaw. We accordingly decline to find that the BIA was "interested in" Evans' estate under TEDRA.

Moreover, Mill Bay points to no authority showing the United States waived its sovereign immunity. Thus, Mill Bay and the IAs could not have employed TEDRA to compel the United States to participate in the state estate proceeding, which forecloses the argument that TEDRA could somehow bind the BIA to the 2004 Settlement Agreement. *See Sisseton–Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir. 1990) ("The doctrine of sovereign immunity precludes suit against the United States without the consent of Congress . . . .").

Even setting aside that different parties were involved in the *Grondal* state litigation and in this lawsuit, the two cases also involved different claims, *i.e.* lacked identity of issue. "Claim preclusion prevents parties from relitigating the same claim," and suits "involve the same claim . . . if the later suit arises from the same transaction" as does the first suit. *Brownback v. King*, 141 S. Ct. 740, 747 n.3 (2021) (cleaned up). Here, the *Grondal* state litigation and this appeal do not involve the same transaction. The *Grondal* state litigation pertained to the membership agreements between Evans/Wapato and Mill Bay but this suit pertains to the Master Lease between the IAs/BIA and Evans/Wapato. Nothing in the *Grondal* state litigation ever claimed to address or resolve whether the Master Lease was renewed. Further, claim preclusion does not apply here because Wapato still had time to renew the Master Lease even after the 2004 Settlement Agreement, and the Master Lease's expiry is the entire premise of this lawsuit. *See Media Rts. Techs., Inc.*, 922 F.3d 1014, 1021 (9th Cir. 2019) ("[C]laim preclusion does not apply to claims that accrue after the filing of the operative complaint in the first suit." (quotation marks and citation omitted)).

For all these reasons, we reject Mill Bay's argument that the IAs and the BIA are precluded under res judicata from ejecting Mill Bay.

## C. Assignment of the Expanded Membership Agreements under Master Lease Paragraph 8

Mill Bay's third defense relates to a provision of the expired Master Lease.  Although prior litigation resolved that Wapato Heritage failed to renew the Master Lease, Paragraph 8 of the Master Lease requires the Lessor-IAs to honor sublease or subtenant agreements even after the Master Lease is terminated "by cancellation or otherwise."  Paragraph 8 (entitled "Status of Subleases on Conclusion of Lease") states:

> Termination of this Lease, by cancellation or otherwise, shall not serve to cancel subleases or subtenancies, but shall operate as an assignment to Lessor of any and all such subleases or subtenancies and shall continue to honor those obligations of Lessee under the terms of any sublease agreement that do not require any new or additional performance not already provided or previously performed by Lessee.

The Expanded Membership Agreements, signed by individual Mill Bay purchasers and Chief Evans, Inc. (predecessor-in-interest to Wapato Heritage), stated that "[t]he duration of this membership is coextensive with the fifty (50) year term" of the Master Lease.  Mill Bay argues that the Expanded Membership Agreements issued by Wapato Heritage and the 2004 Settlement Agreement should be assigned to the IA lessors under the terms of Paragraph 8.

The district court rejected this argument in its 2010 order.  The court concluded that Paragraph 8 did not apply to the Mill Bay members because (1) under both the Expanded Membership Agreements and the 2004 Settlement Agreement, the Mill Bay members were mere licensees, not sublessees or subtenants; and (2) the Master Lease was terminated by normal expiration, not unexpectedly terminated.  Federal law applies to the interpretation of the Master Lease.  *Wapato Heritage I*, 637 F.3d at 1039 ("We also apply federal law because the BIA's role and obligations under the contract are in contention.").  Under federal law, "[t]he interpretation and meaning of contract provisions are questions of law reviewed de novo." *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003).  We hold that Paragraph 8 of the Master Lease does not apply at all because the Master Lease was not terminated "by cancellation or otherwise."[36]

The Master Lease was not "cancelled."   The Master Lease expired after Wapato Heritage failed properly to exercise the renewal option.  Mill Bay argues "or otherwise" expands the type of termination contemplated beyond cancellation and that this phrase should be read instead to mean termination for any reason whatsoever, including normal expiration.   That interpretation contravenes the canon of *ejusdem generis*, which "refers to the inference that a general term in a list should be understood as a reference to subjects akin to those with specific enumeration." *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (internal quotation marks and citation omitted).  So "cancellation" helps define the phrase "or otherwise." Black's Law Dictionary defines cancellation to mean: "An

---

[36] Because Paragraph 8 does not apply, we need not examine whether the Expanded Membership Agreements or the 2004 Settlement Agreement created mere sublicenses rather than subleases.

annulment or termination of a promise or an obligation; specif., the purposeful ending of a contract because the other party has breached one or more of its terms." *Cancellation*, *Black's Law Dictionary* (11th ed. 2019). "Cancellation or otherwise" thus most naturally refers to methods of a lease's termination other than the natural course of time, such as termination due to some action by a party that ends the lease before the contract term concludes. In contrast, termination by normal expiration contemplates that no party breached the terms and the Master Lease ran its full course and simply expired. So Paragraph 8 applies only if the lease was terminated by a party's breach and another party's action in response to that breach, not when, as here, the lease expired on its intended expiration date.

Other provisions of the Master Lease only confirm our interpretation of Paragraph 8.[37] Mill Bay's construction of Paragraph 8 would extend Wapato Heritage's purported sublease to Mill Bay to 50 years, beyond the life of the actual lease between Wapato Heritage and the IAs. But that would contradict Paragraph 7, which states: "No part of the premises shall be subleased for a period extending beyond the life of this [Master] Lease . . . ." Mill Bay's response is that Paragraph 7's "life of this Lease" phrase meant the full fifty-year potential for the lease, not the valid twenty-five-year lease term. But that reading of Paragraph 7 is in turn contradicted by Paragraph 3 of the Master Lease, which states: "The term of this lease shall be twenty-five (25)

---

[37] *Cf. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("The text must be construed as a whole.").

years."**[38]** The way we read Paragraph 8—that this paragraph requires the Lessor-IAs to honor sublease or subtenant agreements only if the Master Lease is terminated before its natural expiration—harmonizes all of these provisions.

Indeed, if the parties intended Paragraph 8 to apply when the lease terminated for any reason, including normal expiration, it is unlikely they would have included language that is naturally read as being limited to premature termination. Paragraph 30 ("Delivery of Premises") of the Master Lease, just a few pages away, proves that the parties could author expansive language when they desired. Paragraph 30 requires the lessee to deliver possession "at the termination of this lease, by normal expiration or otherwise . . . ." Paragraph 30's scope is broad: "normal expiration or otherwise" covers just about everything. But in comparison, and as just described above, the natural reading of Paragraph 8 is more restrictive. To give effect to the precise text in each provision, we must more probably give "termination . . . by cancellation or otherwise" a different, more restrictive interpretation than "termination . . . by normal expiration or otherwise." *See United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 797 (9th Cir. 2017) ("[I]f possible, every word and every provision is to be given effect . . . .").

For all of these reasons, we reject Mill Bay's interpretation of Paragraph 8 of the Master Lease: Paragraph

---

**[38]** Mill Bay's reading here also requires the Court to reach not one but two unlikely conclusions: that a sublessor can grant a sublessee more rights than he holds himself and that the parties meant to allow Wapato Heritage to issue subcontracts beyond the twenty-five-year term regardless whether Wapato Heritage ever actually exercised the lease renewal option.

8 does not apply when the Lease expires by the passage of time, as happened here.

## D. Equitable Estoppel

Mill Bay's fourth and final defense against ejectment pertains to the BIA's alleged prior representations that Mill Bay would be able to remain on MA-8 through 2034.[39] Mill Bay argues that, based on those statements, the court should apply equitable estoppel to prevent the BIA from seeking Mill Bay's ejectment. Below, the district court concluded the equitable estoppel defense is not available under *United States v. City of Tacoma*, 332 F.3d 574 (9th Cir. 2003), in which we held that the United States is not subject to equitable estoppel when it acts in its sovereign capacity as trustee for Indian land. A district court's decision to apply or reject an estoppel defense is reviewed for abuse of discretion but the district court's legal conclusions as to the availability of that defense are reviewed de novo. *See United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc) ("[T]he first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested.").

In *City of Tacoma*, the BIA brought a suit in the 1990s to invalidate Tacoma's 1921 condemnation of land allotted to

---

[39] Specifically, Mill Bay cites: (1) the BIA's receipt of and nonresponse to Evans' 1985 letter purportedly exercising the renewal option (later found to be ineffective), (2) the BIA's receipt of the Expanded Membership Agreements which were marketed to be valid through 2034 and the BIA's approval of the Site Plan modification, (3) the BIA's statement on a form affidavit provided to Washington State Liquor Control Board stating "[Master] Lease expiration date: 2-2-2034," and (4) the BIA's failure to object to the 2004 Settlement Agreement, which assumed the renewal of the lease through 2034.

American Indians in trust patents, land which Tacoma used to build a hydroelectric power project. 332 F.3d at 576–78. At the time of the condemnation, the United States had acceded to the process as trustee, writing in a 1921 letter that it viewed the proceedings as "in all respects legal," and accepted the compensation for the taking of the land on behalf of the American Indian allottees. *Id.* However, in 1939, the Supreme Court interpreted a federal statute (which was on the books in 1921) to require that the United States be named as an indispensable party for all condemnation proceedings concerning trust allotments, which Tacoma had failed to do in its condemnation suit. *Id.* at 579–80. Some fifty years later, the BIA, at the behest of the local tribe, filed a claim against Tacoma to invalidate the 1921 condemnation based on that procedural infirmity. Tacoma, in defending itself against invalidation, argued that the BIA was foreclosed from seeking invalidation under the principles of equitable estoppel. Because the government approved the legitimacy of the condemnation proceedings, as evidenced in the 1921 letter, Tacoma argued the court should not permit the BIA to reverse itself decades later. *Id.* at 581. We denied Tacoma's argument for equitable estoppel, holding that "when the government acts as trustee for an Indian tribe, it is not at all subject to [an equitable estoppel] defense. *Id.* at 581–82.

Here, Mill Bay similarly seeks to use equitable estoppel against the BIA to deny the BIA's claim to possession of land the BIA holds in trust to American Indian allottees. However, Mill Bay argues *City of Tacoma* does not apply. Mill Bay claims that the BIA is not acting as trustee for American Indian land but rather is acting to further its own sovereign and proprietary interests. Mill Bay further claims

the BIA has a conflict of interest and is violating its duty as trustee by favoring the Tribe over the IAs.[40]

Mill Bay relies primarily on *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011), where the Supreme Court described the holding of one of its own prior cases, *Heckman v. United States*, 224 U.S. 413 (1912). In *Heckman*, the government sued as trustee on behalf of American Indian allottees (who impermissibly sold their allotments) to nullify those same conveyances. *See id.* at 417. The Court in *Jicarilla* said that in *Heckman*, the government "was formally acting as a trustee [but] was in fact asserting its own sovereign interest in the disposition of Indian lands." *Jicarilla*, 564 U.S. at 176. Mill Bay suggests that *Jicarilla* stands for the proposition that when the BIA acts as a trustee on behalf of American Indians but contrary to their interests, it furthers its own sovereign interests and is thus not immune to equitable estoppel.

We reject Mill Bay's argument. To begin, Mill Bay cannot claim that the BIA acted outside of the scope of the trustee relationship contemplated in *City of Tacoma*. The BIA's trespass suit is brought pursuant to 25 C.F.R. § 162.471, which expressly states that "[i]f a lessee remains

---

[40] Wapato Heritage asserts that the BIA is acting at the behest of the Tribe, which favors the ejectment of Mill Bay and expiration of the Master Lease (supposedly because the Tribe can maintain low sublease and rental rates for its casino or because the Tribe wishes to relocate the casino to the waterfront, where the Mill Bay RV Park is located). Wapato Heritage suggests that the BIA is favoring the Tribe's interests over the interests of the IAs, which are to recoup the most amount of rent money possible. Wapato Heritage also points to the fact that the BIA's district superintendent through 2017 was an enrolled member of the Tribe (who left in 2017 for a position with the Tribe). Wapato Heritage further points to the BIA's approval of the Tribe's purchases of some of the IA's interests in MA-8 at below market value since the start of this litigation.

in possession after the expiration, termination, or cancellation of a business lease," the BIA "may take action to recover possession on behalf of the Indian landowners." Even under Mill Bay's interpretation of *Jicarilla* and *Heckman* (neither of which involved a claim for equitable estoppel), ejection of a trespasser is a statutory function not at odds with the traditional trustee-beneficiary relationship. Rather, ejectment is a traditional exercise of a trustee's duty to protect the trust property on behalf of the trustees (here, the allottees).

Nor did the BIA act outside the trustee relationship when it helped draft and execute the Master Lease. To administer, preserve, and maintain the trust property is a quintessential trustee function. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) ("[E]lementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. 'One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets . . . .'" (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572 (1985)).

And even if we take as true Mill Bay's accusation that, whether or not the BIA was acting within its powers as trustee, the agency had a conflict of interest, Mill Bay still does not explain how this conflict would convert the BIA's interest as a trustee in ejecting Mill Bay from MA-8 into a proprietary interest of the United States. None of the dues or rent from the property go to the BIA, which retains title on behalf of the IAs in trust in any event. *See Wapato Heritage I*, 637 F.3d at 1039 ("Neither did the BIA become a party to the Lease by acting in its approval capacity or in its limited role as proxy for the 64% of the Landlords who

had given their express authority to sign on their behalf, or with respect to the remaining 36% of the Landowners, for whom it signed as authorized by § 162.2(a)(4).”).

Alternatively, Mill Bay argues that we should cabin *City of Tacoma*’s holding that equitable estoppel is *never* applicable against the United States when acting as trustee for American Indian allottees. We see no reason to do so. The rule—in its broadly stated form—is well-grounded and dates back decades. *See United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 334 (9th Cir. 1956) (“No defense of laches or estoppel is available to the defendants here for the Government as trustee for the Indian Tribe, is not subject to those defenses.”); *Cato v. United States*, 70 F.3d 1103, 1108 (9th Cir. 1995) (“[T]he well-established rule [is] that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses.” (citing *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1083–84 (2d Cir. 1982)).

Last, Mill Bay argues the United States should be granted immunity from equitable estoppel only when full alienation of the allottees’ land is at issue. But the rule as stated in *City of Tacoma* is broad, clear, and admits no exception for instances where alienation is not at issue. Moreover, we have previously applied the rule to a case where alienation was not at issue. In *Ahtanum*, non-American Indian landowners located near a reservation sought to bind the government by estoppel to a 1908 agreement (between the BIA and the non-American Indian landowners) that entitled the landowners to 75% of a reservation river’s water. 236 F.2d at 329. We applied the rule as stated in *City of Tacoma*, concluding that the landowners could not enforce the 1908 agreement based on the government’s “subsequent conduct or approval” of the

agreement because "[n]o defense of laches or estoppel is available to the defendants here for the Government as trustee for the Indian Tribe, is not subject to those defenses." *Id.* at 334. There, as here, the government was granted immunity from estoppel that would have limited by contract the American Indians' use of their land.

We conclude that *City of Tacoma* is not distinguishable and that Mill Bay is barred from asserting its defense of equitable estoppel against the BIA.[41]

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's grant of the BIA's motion for summary judgment on its counterclaim for trespass.

---

[41] Under 25 C.F.R. § 162.471, after consultation with the American Indian landowners, the BIA has authority to remove trespassers even without majority consent from the IAs. Thus, Mill Bay's claim for equitable estoppel against IAs would not grant Mill Bay any relief and we need not address it in this appeal.